United States ex rel. Ahumada v. NISH. And I guess we have a cast here. Mr. Rusty, we'll hear from you first. May it please the Court, Martin Restituto for the appellant, Michael Ahumada. Your Honor, we're appealing two aspects of the lower court's decision, one of them being that the relator's obligations are not based on public disclosures. Which the lower court found. And the second one has to do with the denial for admission of the second amended complaint. So Your Honor, first of all, the first amended complaint in this action was filed under seal in June 2007. That was the first time that the current defendants were named in this action. And at that time, the applicable statute regarding public disclosures was 3730E4. It basically said that no court shall have jurisdiction under this action based upon the public disclosures of the allegations or transactions in a criminal, civil, or administrative hearing in a congressional administrative government accounting office report hearing audit or from news media. Here, we'll be focusing on news media. Unless the action is brought by the Attorney General or the person bringing the action is an original source. Just last month, this court applied this same 2006 version of the False Claims Act when evaluating the case filed, U.S.X.R.L. Rostholder v. Omnicare, Inc. It was provided to Your Honors by appellees. So are you conceding that it's the 2006 version of the statute that applies? Because your briefs seem to focus on amendments. For these purposes, Your Honor, it doesn't really matter. The 2006, as far as the public disclosure allegations, if we're talking about later when defining knowingly, the 2009 version is applicable. We would argue that the 2009 version is applicable here. My point is, under no scenario was there a public disclosure as to the box manufacturers. And if there's no public disclosure, it's the same standard whether it be 2006 or 2009. So, for example, as regards the box manufacturers, the appellant, the plaintiff, had three allegations. One of them was that the defendants, in this case, were invoicing for raw sheets when they were actually providing complete or nearly complete boxes. Other than this action, to date, there has never been a public disclosure about that. So there can't be a failure to have subject matter jurisdiction for public disclosure where there's no public disclosure. The second allegation in the plaintiff's complaint was that the defendants were... Well, I thought in your brief that you never really argued that the allegations in the complaint were not based on a public disclosure, but instead you're focusing on original source. No, that was sort of the backup. There were three allegations. The backup was... So first, let's talk about the panoply of defendants. There are five defendants, four box manufacturers. One is regarding NISH. So for the four box manufacturers, there were three allegations. Two of them have never been publicly disclosed. One of them, it's on the fence. There's an argument that it was. There's an argument that it wasn't, and I'll get into that in a second. For NISH, there were public disclosures, and that's where we're arguing that the plaintiff, the relator, was the original source. Now, the defendants here had their argument with NISH because there were numerous stories about NISH, and so that sort of tipped the balance of the argument one way versus the other. But the reality is that when taken into account and you look at all the allegations against all of the defendants, the original source, as far as him being the source of the stories, is only one portion of it. And he was the source, and he was therefore the original source, but I'd like to sort of lay out the groundwork for the whole scheme so that everybody's on the same page. Where does the requirement of notifying the government about these violations come into play? Did he ever notify the government about it? He did. He actually tried to notify the government three times. So the first time, NISH, which is a quasi-government office, and he understood to be the government, he called up NISH and said, hey, there's fraud being committed at NCED. So NISH, up until that point, he didn't know that NISH was in on the scheme. So NISH rebuffed him and then complained back to NCED saying that, you know, this guy's causing trouble for you. Subsequent to that... But that's not telling the government that. Well, at that point, he understood NISH to be the government. Then the next step... He was wrong about that, obviously. Okay, then the next step is he told the United States Post Office, again, another agency which he understood to be the government. And finally, when all that failed, he then spoke to the FBI. So on three occasions, he actually spoke to the government, and no one will deny that the FBI, at least, is the government. And that was prior to filing the complaint. And, by the way, prior to these public disclosures that are alleged. So the third, by the way, scheme that the box manufacturers alleged that there was some public disclosure is One Story. All of One Story. Cited in the joint appeal record as 205 to 207. The story focuses on NCED and about how it farms out businesses. It mentions only three of the four defendants. It only mentions possibly one scheme, which is them stamping the boxes with NCED's box manufacturing certificate. But it doesn't draw a conclusion one way or the other. It specifically leaves out Weyerhaeuser, which is, according to us, the biggest culprit of these. And so that One Story, which, by the way, I'll show you in a second, he was the original source for, cannot be the basis for dismissing all three allegations and subject matter jurisdiction against all defendants for all three allegations. So, as regards that One Story, by the way, it was the Oregonian was the first newspaper to arrive in El Paso. They were actually drafting a, they were investigating a story about executive, excessive executive compensation and not-for-profits, various not-for-profits across the country, not specifically NCED, not specifically El Paso. In fact, the story cites excessive compensation for not-for-profits in Portland, Tennessee, Texas being one of them as well. How would that benefit your client? Well, let's get, so here's what happens. What would the newspaper disclose? Well, they didn't. That's the whole point. So what happens is he, by the time the Oregonian arrived in El Paso in 2005, it had been already one year, about one year. They arrived in October 2005, and my client was terminated from his employment in July 2004. It had already been one year since he discovered the fraud at NCED. He told the box manufacturers, in particular Green Bay and Smurf and Stone, hey, there's a fraud going on there. Don't do business with them. It had been one year since he complained to NISH. It had been one year since he complained to the U.S. Post Office saying, hey, these guys are committing a fraud. So the Oregonian arrives now. The Oregonian is talking about excessive executive pay in not-for-profit institutions. When they arrive, they meet up with the relator who says, okay, listen, I can put you in contact with folks that will talk about that. Moreover, by the way, I think the real story is that they're not even complying with the JWAG program. You should check that out. The fact is, and by the way, you should check it out because I think NISH is in on it. So subsequent to that point, parting from that point, is when the Oregonian begins to publish a series of stories, now no longer focused on the five or six executives throughout the country that were receiving excessive executive pay. Now all of a sudden, because they received the information from this guy, they're now focusing on NCED. While that's happening, the relator calls up his friend, which is the local reporter, and says, hey, listen, the Oregonian was here a couple of weeks ago. They're going to write a story about NCED. I think it should be reported on by a local newspaper. And so David Crowder, the relator's friend, comes in and then he starts publishing stories about NCED and about their violation. So to put it back in context, one, prior to him filing the complaint, there was only one public disclosure at best against the box manufacturers. Secondly, to the extent that there was a public disclosure, he was the one who informed the Oregonian and the El Paso Times about it. So the timeline begins from there. It's the same for NISH. He uncovered the fraud for all of these folks. Now, so here we go. You call it a fraud. I guess the fraud you're talking about is that they are purporting to comply with a program when in fact they're not. The fraud is that they're actively certifying to the United States government that they comply with a program that allows them to receive no-bid contracts. If they comply with these criteria. That's exactly right. Semiannually by NCED and then signed off by NISH. They file that to say they're complying with the program. Now, was there any discovery of a false statement made by the company here in connection with getting payment from the government for these boxes? I'm sort of confused. The statement is the annual certification. But that's not a false claim. That's a certification to participate in a program. A false claim would have to be the bill that goes to the government. So both. I want to focus on that. Then this goes back to the discussion on materiality which you guys discussed in the previous case. There's two things. One, for every bill that NCED submits and for every box. Did he say he ever saw any bills? Did he see a false statement on those bills? That's how he knows they were billing for raw sheets when in fact they were getting full boxes. But he was only there for six months and a lot of this activity occurred. It must have necessarily occurred after he left. So let's go back to that point. The reality is first when you say he was only there for six months, this gentleman had been in the box manufacturing industry for 20 years. So it wasn't like he did not know what that box manufacturing industry was. When he came on to NCED, he came on as vice president in charge of the corrugated division. There's only two divisions at NCED when he arrived. So there's garments and there's corrugated division. As part of that, he was part of the little handful of management team that oversaw all of the services that NCED provided. While he was there, by the way, Weyerhaeuser was supplying boxes to NCED. International paper, San Antonio was supplying boxes to NCED because the plant manager at El Paso refused to provide the fraudulent services that Bob Jones desired. Nish was always certifying NCED. Smurfett Stone and Green Bay were invited to the plant while he was there because he was trying to increase production and he wanted their input on how he could do that best. So after he left, and by the way, when he came over to NCED, he brought his team from Smurfett Stone. So it wasn't like he didn't have friends there that he was talking to. And so the fact is that after he left, he continued to talk to these people. So when Green Bay, by the way, he approached Green Bay subsequent to leaving and says, hey, listen, they're committing a fraud there. I want to start a legitimate business. What happens is Green Bay reports back to NCED. NCED starts making boxes with Green Bay, and when he finds out, he's already got all the pieces of the puzzle. Green Bay had been there. He had been there. He knows there's a fraud. He tells Green Bay about the fraud. All that needs to happen is that one of his friends says, hey, by the way, Mike, Green Bay is now making boxes. He calls up Green Bay at Wisconsin. By the way, the vice president of Green Bay at Wisconsin doesn't just take a call from the janitor of NCED. So he is this person in the industry. He calls up Green Bay in Wisconsin and says, hey, your guys are committing a fraud by making these boxes. That was ignored. Smurfett Stone, again, he finds out he worked at Smurfett Stone for 20 years. He was part of this president's club. He knew everybody at Smurfett Stone. When he finds out Smurfett Stone is making these boxes, he goes to the guys at the plant. He says, Manny, Manny Loera, you're making boxes. Oh, listen, Bob Jones has contacts in Washington. Don't worry about it. We got this taken care of. So they, too, chose to ignore it. So I think the allegation that these things happened after he was gone and that somehow he didn't know about it, he was already in the mix. There was no way for that to happen. My red light is on. You do have some rebuttal time. We'll see you back then. I guess we'll hear first from Mr. Weaver. Yes. May it please the court, I'm Robert Weaver. I am counsel for Smurfett Stone container. And I've been asked to speak on behalf of all the defendants to the issue of whether or not the plaintiff in this case has adequately established his credentials as a original source of that which was publicly disclosed and that is found in his complaint. And Mr. Fitzgerald will speak following me to the question of whether or not the requirements of Rule 9 and Rule 12 have been met. It seems to me that plaintiff is at point now of having to establish himself as an original source under the claims bar test. Although his brief at page 11 says there's no evidence that he relied on any public information in bringing the action, the truth is he quotes from the newspaper in his complaint. He quotes extensively from the 2010 Lopez trial. The court below found that there was a striking similarity between parts of his complaint and actual quotes from the newspaper articles that appeared in the fall of 05 and the spring of 06 before his initial complaint. So we are at the point I believe of him having to establish by a preponderance of evidence that he was the original source of that which is in his complaint. I would like to invite the court's attention quickly to three points which I believe either one of which are sufficient to affirm. As the district court noted, there are several claims in the complaint that appear to come directly out of the newspaper accounts and he has repeatedly failed to rebut that. He's been given opportunity after opportunity after opportunity. The first affidavit that we saw was in reply to our opposition to his motion to file the second amended complaint. It is very generic, very plain, very unspecific. He does not address any of those things that came out of the newspaper in any way that would establish that he had independent knowledge in how he came to it. That's number one. Number two, in several paragraphs in both the affidavit and the complaint, he admits that his information is coming from third sources which by law prevents him from having direct and independent knowledge. And thirdly, there is nothing to establish that he told the government anything at all fraudulent about any of these defendants. I understand in his oral argument this morning that he is conceding the point that he does not enjoy the retroactivity that the amendments to the False Claims Act to which he's trying to claim entitlement to that they are, this court has held that they are not retroactive and I understand that he's abandoning that. But it does, he's repeatedly says that and it strikes us as that he has relied on that aspect substantially in briefing this case. On my first point, which is the public disclosure, just an example. Paragraph 162 of the complaint, the complaint is the Joint Appendix 227, recites three compliance reviews that Nish did. This is where Nish goes in and does not an audit but some kind of a compliance review. That was reported in the JA 186, the March 6th Oregonian article and the PBS documentary that followed it said that the Oregonian got that through a Freedom of Information Act request. He has failed to tell us if he has independent knowledge of that, what it is and where it came from. And we would suggest that the reason is he can't. He was gone, he was never there when the first two audits, I'm sorry, compliance reviews occurred and he was gone when the third one occurred. As head of the Corrugated Box Division, it is hard to imagine that he would have ever been involved in anything to do with Nish. Another example, Paragraph 104, Nish signs off on some of these 404 forms which are disability certifications. They don't appear in his first complaint. They appear for the first time in the proposed Second Amendment complaint. The intervening event was the Lopez trial where these were a big deal and they're at JA 514 and 519. Lastly, on this subject, there was an Oregonian article on March 5th of 06, JA 145 where it recites that Nish's revenue by the end of 04 had climbed 86% over four years to 58 million annually. That appears exactly in his proposed Second Amendment complaint. He never tells us if he didn't get it from the Oregonian where he got it. His attempts to establish direct and independent knowledge are speculative at best. I want to jump to the FBI issue. Yes, sir. Why is that not the case? It is normally the case that in analyzing this issue, the court goes to the issue that Judge Hamilton raised which is where in the record does it appear that you've told the government about this. My short answer to you, Judge Diaz, is nowhere. I think that kills his claim right there. I would acknowledge that this Weyerhaeuser complaint is the first time he comes close to something that he learned on the job that's arguably independent and direct, but he misses third base going around to home when he doesn't establish the fact that he told this to the FBI. The FBI at paragraphs 20, 23, and the affidavit at 24A are very general. He says nothing about Nish. He says a lot about NCED because that's who he thought was engaged in the fraud. The other thing I would say about Weyerhaeuser is under voo-you-roo, you have got to connect the allegation of misconduct at some point to a specific false claim or presentment, which he does not do. And so those are my answers to that question. Also, I think Rockwell, the Supreme Court case, is informative on this because it says, joining all claims in one lawsuit even if that one claim could stand alone does not save a complaint that otherwise is deficient under the claims part. I do want to speak to, I want to be sure that I speak to the issue that seems to be raised for the first time in the reply brief, which is whether or not fraud was really disclosed about these defendants in the public disclosures that preceded his complaint. Prince and the Marion County case both say that disclosure must contain allegations or disclosures sufficient to give an inference of fraud. And I think it's the plaintiff's view that anything that was said about the box manufacturers was plain vanilla. I would just invite the court's attention to one newspaper article, JA 206, the November 27th, El Paso Times article. It relies on Jesse Cruz, who was still at NCED, who said he received boxes from I.P. Smurfett in Green Bay. I pause to point out, if it's Jesse Cruz that was the original source of that article, it's not the plaintiff as he claims to be. He wants to be the first domino for the public disclosures, but he certainly was not on this. The article cites anonymous complaint to the Committee for Purchase that NCED certifies that its disabled workforce produces the product but farms out the entire work to smaller firms, each of which alters its paperwork. Cruz was quoting as saying it's not an isolated instance. They've been doing it for years. A Smurfett spokesman agreed that, yes, we've been doing it because it's customary. And Cruz provided copies of the bills from International Paper. Just that story alone reveals all of the elements of fraud that are in his complaint. The NCED was cheating the government by falsifying the labor requirements, that they were able to do this by farming out the box manufacturing to the box manufacturing firms. And the box manufacturing firms must have been in on it. He says so. Each firm alters its paperwork accordingly. So right there is a sufficient allegation of fraud in the public record that he has failed to explain why he was, why he has independent knowledge of any of that. As regards the Nish matter regarding the disclosure to Mrs. Granadetti, we again would point out that nothing about that was ever said to the FBI. And it's really speculative because what he says there is that he didn't say Nish is in on it. He infers that Nish was in on it after he left employment and after he made that remark to her. And then nothing happened. It is an inference. And under every case that we've read from the Fourth Circuit, that kind of speculation and inference is inadequate for him to meet his burden. The findings below were not clearly erroneous. To your knowledge, did the FBI ever conduct any investigation? After the fact, after all the newspaper articles came out, they did do an investigation, Your Honor, and there were indictments, convictions, and imprisonment for the NCED people. What's unusual about this case and why I think it's very similar to Biryuru is in the normal Kitam case, at the time you file your complaint, you file a disclosure of all of your independent information at the same time so we can see what it was you had at the moment you had the complaint. But we don't have that here. He has just general statements that I met with the FBI and I told him about JWAG fraud or I told him about schemes. So if the FBI was helped by him, it sure doesn't come across in his pleadings. May I ask another question before you sit down? You focused, in response to my inquiry about Weyerhaeuser, about the fact, and Judge Hamilton raised this issue about the reporting element, but there was evidence in the record, was there not, that he did speak to FBI agents around 2006 and told them everything he knew about the current defendants. Is that not accurate? I don't know. The quote that I remember is he told them about... About all of the defendants, everything he knew about all of the defendants in January of 2006. That's at JAF 578. I know I wrote that down and I can't find it now. He, I would suggest, if that's what I'm trying to find the exact note, but I can't, that I made to myself about that. I do believe that that is inadequate. Because what this court has to determine is whether or not, under the, what is valuable about, to the government, what is valuable to Congress about this claims bar issue is, did he advance the ball? Did he have, first of all, did he have independent and direct knowledge, other than, you know, in other words, not from third sources and not from the public sources, and did what he say advance the government's interest, advance the ball? And the only way you can assess that is, did you say, did you say, we're cheating the government, we at NCED, and I have had conversations with these box manufacturers in which I said, and here's how we're doing it. We're taking your boxes, we're passing them off as ours, we're taking your invoices, converting them to ours, and the government doesn't know any better. And were he to have said that and shared that with the FBI, that would have advanced the ball. Our, what we would have done in those conversations with the FBI, is that they're just too vague. Thank you. Alright, Mr. Weaver, Mr. Fitzgerald. May it please the court, Matt Fitzgerald, to address the additional grounds for affirming the judgment of the district court. So there are a handful of these grounds appearing in the briefs, but there are two that I'd like to address here. First, failure to plead fraud with particularity under Rule 9B, and second, a failure of the element of materiality under the False Claims Act. And before I address these, just briefly to correct a statement made earlier, there is no Now, with regard to Rule 9B, the allegations in this case cover seven years, they cover, quote, hundreds or thousands of alleged false claims to the government, different products created by different manufacturers at different times, and in fact, there are five defendants in this case, not one of whom is itself ever alleged to have submitted a false claim for payment to the government. Well, even as to NCD, he just alleges a generalized statement, but then he doesn't allege any agreement among the parties that could amount to, that's what your argument is, that could amount to a submission causing the false claim to be submitted by the defendants in this case. Correct, Your Honor. And so, and in fact, the manufacturing defendants, which is a handle for referring to the four independent manufacturing companies, the term manufacturing defendants is used in the second amended complaint no fewer than 46 times, and again, that's the second amended complaint, so his third effort to plead fraud with particularity under Rule 9B, and that lumping together of the manufacturing defendants is essentially, it seems to create a whole that looks bigger than the sum of its parts, because if you look at the allegations in the specific allegations, or the allegations defendant by defendant, there are big holes in each one. So, for instance, although there are allegations that the manufacturing defendants gave rebates, the manufacturing defendants were told of the fraud at NCD, the manufacturing defendants got tours, for instance, there's no allegation that International Paper ever gave a rebate at all, there's no allegation that he told any specific person at International Paper even received a tour of the facility, and so, similarly, he's identified Weyerhaeuser, the reply brief identifies Weyerhaeuser as, quote, the biggest perpetrator of wrongdoing in the second amended complaint, but there is no allegation anywhere in the second amended complaint that Ahumada told Weyerhaeuser anything about the fraud at NCD, he's just got this, I told the manufacturing defendants, generally. So, the second point is, there's a failure to plausibly plead the element of materiality under the False Claims Act, and the rule that applies here is that in certification cases, that is, where the bills to the government or the annual certification forms are certifying regulatory compliance, the key is that the condition must be a condition of payment by the government, not just a condition of compliance with a program like JWAD. Here, obviously, the nub of the fraud is that NCD did not have 75% severely disabled labor, that is a condition of participation in the JWAD program, not specifically a condition of payment by the government. I mean, the government here ordered boxes, it received the boxes that it ordered, this is nothing like the more common False Claims Act claim where, for instance, the government ordered 100 boxes and it got 50 boxes, but the bill said 100, or it got deficient boxes, or as frequently happens in the Medicare context, it ordered 100 boxes and there were no boxes. Here, the government ordered the boxes, it got the boxes, and it paid for the boxes even when it came out that NCD was not in compliance with the JWAD program. So, to... Were the requirements of those contracts, I'm now looking at the Omnicare cases like Harrison, was there a responsibility to certify with each bill that the boxes complied with JWAD? Well, there's nothing about the contracts in the Second Amended Complaint or the record, Your Honor. What about the statute or the regs under submitting bills? When you submit a bill, do you have to certify that this complies with JWAD? I'm not aware of any such requirement, Your Honor. And what the regulations actually say is, it's 41 CFR 51-4.5 and it addresses what happens when one of these non-profits falls below 75%. It details investigation, a chance to defend itself, and at the end, the risk is expulsion from the program. So, there isn't... The idea that the government would not pay for boxes that are adequate is not supported by the regulations under the JWAD program. So, finally, there was some discussion earlier of what Ahumada had told Green Bay specifically. And so, generally under 9B, just to bring that back together. So, there... To respond to his allegation about what he told Green Bay. First, if you look at the allegations about what Green Bay is actually alleged to have done, there are no specifics whatsoever about any sort of improper billing by What Green Bay and Smurfett Stone did to allegedly contribute to this fraud was make postal sleeves and sell them to NCED. And so, by trying to show that they knew and knowingly participated in the fraud based on what he told them, it's relator's burden to show, and the minimum standard of knowing is reckless disregard, which has generally been described as an aggravated form of gross negligence. So, the relator needs to show that based on what he told Green Bay and Smurfett Stone, it was an aggravated form of gross negligence for them to simply do business with NCED at all. And the complaint does not support that. The second... Why did the complaint support that claim as to Warehouse given the fact that the representatives where he saw, according to the relator, the fraud in its full bloom? Correct, Your Honor. Well, first of all, a tour on one day of the plant could not possibly have given rise to the inference that NCED was out of compliance with the JWOD program. And that's because the requirements of the JWOD program are for total direct labor, 75% severely disabled, total direct labor on an annual basis. So, as a matter of law, any one given day, any one tour of the facility by any one person could not create an inference of knowledge that NCED was out of compliance with JWOD. Additionally, I note that there's no detail at all about what was shown in particular on the tours or what the narration or description was of the tours. And it doesn't seem a fair inference that the tours were narrated in a way that pointed out the fraud to these businessmen from other companies whose own companies were not subject to JWOD and had no particular reason to know anything about the details of that program. So, in sum, the False Claims Act requires materiality to payment, not just to a condition of participation in the program. And under Rule 9b on the third try, the relator cannot lump four independent companies together 46 times and still get past Rule 9b. If there are no further questions, I'll cede the rest of my time. Thank you, Mr. Fitzgerald. Mr. Restituto. Sorry, Your Honor. Back. So, first I'd like to discuss Weyerhaeuser, which I think Judge Diaz correctly focused on. So, let's go to Weyerhaeuser. There's two particular schemes that Weyerhaeuser was involved in. One was a fraudulent billing scheme, which was sending raw sheets and billing for raw sheets when making nearly complete boxes. There is no legitimate reason for doing that except to defraud. Secondly, there's also no legitimate reason for billing and trust. There's no legitimate reason. They can hide and say a whole bunch of things, but there's no legitimate reason for that. As regards international paper, international paper had to plant in El Paso. What was the false claim against the United States government with respect to Weyerhaeuser? So, the false claims are two. I read your complaint. I just couldn't find a single false claim. Okay. So, there's three. One of them is that by, and then we'll go in reverse order. So, by stamping the boxes with NCED stamp, which says that these boxes have been manufactured by severely handicapped individuals, which is a requirement for participating in the program. I'll read you those requirements in a second. I understand. My trouble is on this question. My trouble is the same issue that we had in Omnicare, which is there is a program that the government's interested in. They're interested in this JWAG program and they require certification for compliance and you get some special relationship with the government. But, while in that program, they build boxes and sell boxes to the government and in connection, I could find no place where in connection with submitting a claim for payment, they had to certify that the box complied with JWAG as a condition of payment. And there's no allegation that the bill says that. There's no allegation that it's required and I'm not aware, obviously I may not know all the corners of the regulations, but I'm not aware of any regulation that requires that. And in Omnicare, we said in that circumstance, the government was, there was not a false claim made against the government. Now, there may be in that case, it was practices that they couldn't conduct their business. They couldn't even manufacture them that way. As a matter of fact, they were adulterated. They found they were adulterated. So, they're selling adulterated goods to the government. We still didn't find a false claim because the government pays, always pays for adulterated goods. What they do is there's other sanctions. Now, here, there's a program, a congressional program that requires certification to be in the program. But, the question is when you are submitting the claim for the boxes, was there ever a false claim made in connection with that submission? So, in theory, every claim submitted where it's stamped that it was made by severely disabled individuals was a false claim. And the reason being... That's like saying on a package of aspirin that the disclosures were false. You sell the aspirin and they pay for the aspirin and the government pays for it. So, there's a reason why NCED was the only one that could provide postal trays to the government and not Weyerhaeuser, who clearly had the capabilities for making them. There's a reason why NCED could provide the boxes, the GSA boxes, where International Paper, Smurfit Stone, or Green Bay could not. And that reason is because... Just a minute. Direct me to the complaint. A portion of the complaint where you see, where you allege that a claim was made to the government in connection with the sale of these boxes that was false. Any statement that was false in connection with the sale of a box and the payment by the government for the box. So, okay. So, there's... I'll get back to the complaint in a second, Your Honor, because I don't have it memorized. There is an allegation in there, just a conclusory allegation that you made a false claim. But there's a number. So, let's go back. There's three. As regards to Weyerhaeuser, which we're going back to Weyerhaeuser. So, first it's the That is a condition of payment because it's a condition of participating in the program. It's not like... It does not follow unless there's a regulation or a contractual requirement. Unlike, Your Honor, unlike your Omnicare situation here, the fact that it's a requirement is belied by what the government actually did to enforce this regulation. So, first of all, it prosecuted criminally the people who defrauded the government. Didn't they continue to pay for boxes afterwards? Even after discovering the fraud, they continued to pay for boxes? And the reason is because this is a program specifically made for providing employment for severely handicapped people. So, that would be like saying... I mean, imagine the pink slip. Dear severely handicapped individuals, we are closing your plant and firing you because there's a handful of non-handicapped people who committed fraud in your name. That would defeat the purpose of the statute. You're missing my question all together. The statute, the JWAG statute was violated. And they misrepresented and they covered it up and they lied about it and they had kickbacks and they had everything. And those guys were prosecuted. But the False Claim Act is under a specific act that has specific requirements that say you have to make a false statement in connection with a claim for payment from the government. And I'm looking for that. And my point is, you're just saying it's fraud because they sent bad boxes, but that doesn't satisfy the False Claim Act. Let's get away from the bad boxes. Let's talk about the rebate. Fair enough? So, Weyerhaeuser... Well, not fair enough. Well, no, no, no, no, no. I understand. I need one of two things. Just understand. I need to find where there was a contractual obligation to make the statements you say. Number two, where there's a regulation. Or a regulation. Okay. There was a contractual obligation to provide the cost for the boxes, the accurate cost for the boxes to the government. Where's that? That's in the contracting documents for, under JWAD. So it's a cost plus program. So, the box, the NCD, the contractor, provides the government with a list of costs, says these are my costs, and therefore my margin of gain is X, and therefore... Where's all that? I don't see all that. I didn't see any of that. It was in the, I mean, it was in there and it was in the briefs, especially the original briefs to the... No, I'm talking about the false claim. But here's my point. So, by not providing the government with accurate information as to what the underlying costs of the boxes were, i.e., by saying, hey, bill me higher so I can bill the government higher. Yes, that's... And where's that? Your Honor, it's in the CFR. I don't have the complaint, I don't have the actual language in front of me, but that is the rebate scheme. Otherwise, there's no reason for the rebates. They wouldn't be fraudulent. If they didn't have to pass on the cost to the government, if they didn't have to pass on the rebates to the government, there would have been no reason... The rebate scheme may be fraudulent, but the False Claim Act requires a false statement to be made to the United States government for the payment of money. The false statement was that this box costs X amount, when in reality, that box did not cost X amount. Where's that alleged? I didn't see that. Even in your proposed second amended complaint, I didn't see that. In the proposed second amended complaint, I understood that that was the part, that was the rebate scheme. Otherwise, there's no reason for a rebate scheme to be alleged. Your Honor, I am done. Is that... I mean... If you have questions, I would gladly continue. Alright, thank you, Mr. Restituto. We'll adjourn court, signee die, and then come down and greet counsel. This is an honorable court, the stand is adjourned, signee dies, God save the United States, this is an honorable court.
judges: Paul V. Niemeyer, Albert Diaz, Clyde H. Hamilton